***********
The Full Commission reviewed the prior Order and prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar, the briefs and oral arguments before the Full Commission, and the additional evidence allowed into evidence by the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 *********** EVIDENTIARY RULING
1. On June 28, 2005, the defendants filed a motion with the Industrial Commission to be allowed to obtain Employment Security Commission records with respect to the plaintiff's claim for benefits therewith.
2. On June 28, 2005, Commissioner Laura K. Mavretic allowed the Motion and entered an Order to the Employment Security Commission to provide said records.
3. Plaintiff thereafter moved pursuant to N.C. Gen. Stat. § 97-85 that the Full Commission receive the aforesaid records of the Employment Security Commission as additional evidence.
4. Plaintiff's motion to admit into evidence the records of the Employment Security Commission is ALLOWED.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Royal SunAlliance was the carrier on the risk.
3. An employee-employer relationship existed between Donna Crandall and Lincoln Medical Center at all relevant times.
4. The date of the alleged injury which is the subject of this claim was August 29, 2003.
5. An accident occurred in this case on August 29, 2003. However, the defendants did not admit that there was an injury arising out of the accident.
6. Plaintiff is Donna Crandall. Her date of birth is May 23, 1958, and as of the date of the hearing before the Deputy Commissioner in this matter, was forty-six years of age. She was employed as an operating room nurse for Lincoln Medical Center.
7. Plaintiff's average weekly wage was $1,016.00, which was sufficient to yield a weekly compensation rate of $677.37.
8. The issues for determination are:
a. Did plaintiff sustain any compensable consequences of the incident on August 29, 2003 which may entitle her to benefits under the Act; and,
b. Did plaintiff constructively refuse suitable employment.
9. The parties stipulated the following documentary evidence into the record:
a. Medical Records (442 pages);
b. I.C. Forms and Filings;
c. Plaintiff's Answers to Interrogatories; and,
d. Plaintiff's personnel file.
 ***********
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was hired by Lincoln Medical on August 18, 2003, as a circulating nurse in the operating room. Eleven days later on August 29, 2003, plaintiff suffered an admitted work-related accident. She was out of work until September 10, 2003 when she returned to work on light duty. Her employment was terminated by Lincoln Medical on September 29, 2003.
2. On November 17, 2003, defendants filed a Form 61 contending "present medical condition not a direct result of your employment." As a result of the defendants' refusal to provide compensation before and after the plaintiff came out of work, a Form 33 requesting a hearing was filed on or about December 4, 2003.
3. On April 19, 2005, plaintiff filed a Motion to Take Additional Evidence. On May 3, 2005, the chairman of the Industrial Commission entered an Order holding plaintiff's motion "in abeyance until consideration by the Full Commission at the hearing of this matter."
4. Plaintiff worked as a nurse for a number of different employers in the Midwest, and, more recently in North Carolina since she and her husband relocated here. Plaintiff has enjoyed her work and excelled therein as evidenced by the honors, specialized degrees and certifications that she obtained and the 16 years she has worked as a nurse prior to going to work for Lincoln Medical.
5. Plaintiff was in an automobile accident in Illinois in 2000 and sustained a lacerated liver, some injury to her back, and cuts to her face. As a result of that accident, she missed approximately 2-1/2 weeks of work. She had also had varicose vein surgery.
6. Plaintiff had a prior work-related injury in January 2003 when a chair fell out from under her while she was employed as a nurse at the VA Hospital in Asheville, North Carolina. She missed little, if any, work as a result of that accident and no workers' compensation claim was filed.
7. Although plaintiff had been injured on several occasions prior to her on the job accident of August 29, 2003, none of those prior accidents had left her with the persistent, chronic pain that she has experienced since August 29, 2003. In every event prior to the stipulated accident of August 29, 2003, when the plaintiff was injured, she was able to return to work within a few weeks without restrictions.
8. When hired by Lincoln Medical, plaintiff was in good health, was free of back pain, helped her husband with the yard work, and enjoyed activities such as fishing with her husband.
9. The physical demands of plaintiff's job were "frequent walking, standing, sitting, lifting, reaching, stooping, bending, pushing and pulling, must be able to lift and support moderately heavy weight in handling patients, medical equipment, and supplies, and have good finger dexterity." Plaintiff had a 90-day probationary period following her hiring by Lincoln Medical.
10. On Friday, August 29, 2003, while still in her orientation period, the plaintiff was injured when she was attempting to remove one or more portions of an operating room table having a combined weight of approximately 56 pounds. On the day of the accident, with a sedated female on an operating table with her legs placed in stirrups for a gynecological procedure, plaintiff attempted to remove the foot and head pieces of the operating table so that the surgeon would have the necessary access to the patient. When the plaintiff attempted to remove the piece or pieces of the table, while bent over in an awkward position, one or more pieces of the table suddenly came off in her hands, and jerked and yanked her body down to the floor. Plaintiff was able to release that part of the bed just before it struck the floor. For an instant, the plaintiff tried to hold the bed and keep the dislodged table portions from falling onto the floor for fear that the patient that was on the table at the time would fall as well. Plaintiff felt and reported immediate sharp pain in her left arm, neck and back.
11. An accident report was filled out by Robbie Hoffman, an employee of Lincoln Medical, which indicated that the time of the accident was 13:28 (1:28 p.m), and that both of plaintiff's shoulders and her upper and lower back were injured. The accident report described the accident as "removing foot piece from bed, and when pulling the foot piece, the entire half of the bed (foot piece and leg section) disengaged from the bed."
12. Jill Patterson, director of surgical services at Lincoln Medical, testified at hearing that she understood the plaintiff was injured as a result of the bed coming apart. Judy Sigmon, a surgical tech at Lincoln Medical, also was aware that the plaintiff "was going to take the bottom of the bed off so that the doctor could get up closer for the examination, and the bottom of the bed fell off." Following a loud noise, Ms. Sigmon heard the plaintiff state, "my back hurts."
13. When seen shortly after the accident at the Lincoln Medical Emergency Room, plaintiff was noted to have "acute myofascial strain — neck, dorsal, lumbar," and "acute low back pain." After being seen and evaluated for a number of hours, she was discharged with a restriction of "no bending or lifting for 1 week." Plaintiff was also instructed: "Rest more than usual. You may need to rest in bed for the next few days."
14. Because her pain was no better, plaintiff advised her supervisor that she was not able to return to work as she had hoped. Plaintiff was then told that she would need to be seen by Dr. Theodore Igbinigie at First Foundation Clinic of the Carolinas. On Tuesday, September 2, 2003, following the instructions of defendant-employer, plaintiff saw Dr. Igbinigie. He examined plaintiff and noted: "L shoulder pain radiating down." Dr. Ibginigie gave her an injection of Toradol and ordered that a cervical, thoracic, and lumbar MRI be performed.
15. At the direction of Dr. Igbinigie, a lumbar spine MRI was taken on September 6, 2003, and revealed:
 Multi-level osteophytosis facet joint disease is advanced for the patient's given age. Moderate degenerative disc disease most pronounced at the L4-5 disc level where a large annular tear, moderate central disc protrusion, and broad-based disc bulge are present that conspire with degenerative joint disease to create mild-moderate canal stenosis.
16. A thoracic spine MRI also taken on September 6, 2003, showed:
 1. Annular tear and central disc protrusion at the T8 disc level minimally deforms the ventral aspect of the adjacent cord although no cord signal abnormality is found. 2. Exuberant osteophytosis advanced for the patient's age. 3. Degenerative endplate disease at T11 vertebra. No acute fracture features are seen.
17. Dr. Scott McCloskey, a neurosurgeon, first saw Plaintiff on September 10, 2003, on referral from Dr. Theodore Igbinigie. He reported: "She related having pain about her back and left arm." His impression was "cervical strain, thoracic disc herniation, T8-9, small, not surgically significant, and post-traumatic lumbar disc injury at L4-5. No surgery indicated." Dr. McCloskey continued her on Naproxen and allowed her to return to work with a lifting restriction of 25 pounds.
18. On October 17, 2003, Dr. McCloskey signed a note entitled "To Whom It May Concern" indicating that plaintiff "may not return to work until after re-evaluation on 10-29-03." On October 29, 2003, Dr. McCloskey saw plaintiff for a second time. At that point, she reported a lot of pain in her hands, arms, neck, and mid and low back. He noted:
 [T]here is a small disc bulge in the mid-thoracic spine, and annular tear at L4-5. I think that there are some anatomical reasons for her to have the pain, but it is difficult to really localize one particular problem. Overall, however, it seems that she is having more pain than what could be tolerated at a place of employment. She is going to stay out of work. I think that she is likely going to be disabled from this injury, but I do not recommend any surgery . . . I do, however, think that it would be prudent for her to pursue pain clinic management . . . I would be glad to re-evaluate her in about 3 months. She relates having been terminated from her job.
19. Following his visit with her on October 29, 2003, Dr. McCloskey signed another note entitled "To Whom It May Concern" stating that plaintiff was seen in his office on that day and stated that she may not return to work until after re-evaluation on January 19th.
20. After reviewing the photographs of the position in which plaintiff was required to be in order to remove the portion of the operating table, he testified that "it would seem as this incident as described aggravated a possible pre-condition of her spine." Dr. McCloskey commented that "the MRI's [from September 6, 2003, as ordered by Dr. Igbinigie] were not, you know, frankly 100% normal. She did have some disc changes, and trying to give her the benefit of the doubt, some of these discs might be a source of pain."
21. Dr. McCloskey affirmed that "in some instances of low back pain and other back injuries involving soft tissues that there can be pain where there's no demonstrable anatomical reason at least with the state of the art CT scans and x-rays and MRI's at this point." Dr. McCloskey also did not doubt that plaintiff had some soft tissue injury as a result of the accident of August 29, 2003.
22. On October 31, 2003, plaintiff was seen by her internist, Dr. Burton, and diagnosed with depression. She was placed on Paxil.
23. On January 19, 2004, Dr. McCloskey signed an out of work note indicating that plaintiff "needs to continue to be out of work until she has a second opinion with another surgeon. This will be set up and approved by W/C. Next work note will come from second opinion doctor." Dr. McCloskey testified, "I suspect she came in and requested that, and we saw no reason not to give it to her if she said she couldn't work."
24. Plaintiff was referred by Dr. McCloskey to Dr. Paul Lefavore of Unifour Pain Treatment Center for pain management. Dr. Lefavore treated plaintiff for pain on March 15, April 21, May 20, June28, and August 25, 2004. Dr. Lefavore testified in this matter as an expert in the field of pain management.
25. When Dr. Lefavore first saw plaintiff on March 15, 2004, she reported pain since August 2003 in the thoracic and lumbar region of her spine. The pain complaints were consistent throughout his treatment of her. On their first visit, plaintiff was on Anaprox, Flexeril, Darvocet, Paxil, and Aciphex. Dr. Lefavore approved of plaintiff's use of those medications.
26. At the time she first saw Dr. Lefavore, plaintiff filled out a New Patient Questionnaire, and indicated that she was unable to sleep well, with only two-three broken periods of sleep per night. In that intake questionnaire, plaintiff indicated that she liked her job "all the time when I worked," and that she wanted to return to work. Dr. Lefavore testified that "pain is always a subjective finding." Moreover, Dr. Lefavore testified that he found her subjective report of pain to be "definitely credible." Dr. Lefavore also testified that on March 15, 2004, plaintiff was "very sensitive to just touching the skin, there are patients who do have sensitivity to the skin develop when they have chronic pain, so that is credible."
27. In reviewing the MRI lumbar spine study from September 6, 2003, Dr. Lefavore noted that the radiologist felt plaintiff had an "annular tear." Dr. Lefavore felt that the clinical significance of a mild to moderate canal stenosis depends on the patient's report. He stated that "[t]here are patients who have those conditions who have no pain. There are patients who are symptomatic from those problems." The pain reported by plaintiff to Dr. Lefavore was consistent with the finding from the MRI studies. After reviewing the photographs showing the posture necessary to remove the foot portion of the operating table, Dr. Lefavore testified "so it could certainly be an injury related to something like this, a heavy weight bent very far forward using the back musculature could injure the musculature, yes."
28. Dr. Lefavore gave plaintiff trigger point injections on March 15, 2004, in an effort to relieve her pain. He also referred her for physical therapy. Dr. Lefavore had continued prescribing Darvocet to plaintiff (as initiated by her internist, Dr. Burton), and had not observed any indication whatsoever that plaintiff was abusing her narcotic medication.
29. Although Dr. Lefavore's practice avoids issuing work restrictions, the patient's pain reports were credible, as were her reports that sitting, lying down, and exercise or bending made her pain worse. Dr. Lefavore recommended that plaintiff begin vocational rehabilitation because "given the amount of pain that she was reporting to me, I really didn't see how she could be going back to work as an OR nurse."
30. On August 25, 2004, plaintiff asked Dr. Lefavore about a possible thoracic outlet syndrome. Dr. Lefavore indicated that a thoracic outlet syndrome "could be something that would account for some of this numbness and tingling that she had in that extremity." Dr. Lefavore saw plaintiff on August 25, 2004, the day of his deposition, and felt that plaintiff had reached maximum medical improvement from a pain management standpoint. After releasing plaintiff, Dr. Lefavore suggested she might continue to try physical therapy and chiropractic manipulation.
31. Dr. Lefavore prescribed a TENS unit for plaintiff in an effort to try and provide her with pain relief. Dr. Lefavore found her reports and complaints to him to be generally consistent and found her to be credible and cooperative in her treatment with him.
32. Dr. Finger saw plaintiff on February 10, 2004. His impression was multiple degenerative changes of thoracic and lumbar spine, primarily with relative spurring of cervical spine and "severe muscle spasms." Dr. Finger recommended physical therapy. Plaintiff called back late that afternoon and left a message on Dr. Finger's answering machine "just crying with pain." She was quite distraught, highly emotional, and said that she just was hurting worse than ever from the base of her skull down to the bottom of her buttocks. Dr. Finger thought a psychiatric or psychological evaluation might be appropriate for plaintiff.
33. Plaintiff was also seen by Dr. Burton, her family physician at McDowell Internal Medicine, P.A. (Hearing T.p. 35, L. 2 1-25). As a result of her ongoing disability she has suffered with depression and has been taking anti-depression medications that are prescribed by Dr. Burton. Dr. Burton has also prescribed Darvocet for plaintiff's pain.
34. Dr. Burton had the benefit of treating plaintiff both before and after the accident of August 29, 2003. On June 21, 2004, Dr. Burton wrote:
 To Whom It May Concern: This is a note on behalf of Donna Crandall [plaintiff] just clarifying some issues that were not necessarily outlined in my notes. She continues to have significant thoracic and lower back pain as well as continuous numbness and tingling in her fingers related to this. She has primarily been followed at another doctor's office for these problems and, therefore, my notes do not reflect the extensive work up she has had nor the disability she is experiencing related to these symptoms. She continues to have very significant disabling pain at this point, and is unable to work at this time.
35. Plaintiff was issued restrictions on the date of the accident and she continued to be restricted in her ability to work up to the date of the hearing by various physicians. Those restrictions are detailed in the appended "Work Restrictions Summary" which is incorporated herein by reference.
36. According to Dr. McCloskey's September 10, 2003, note, plaintiff was under the following restrictions when she returned to work on or about September 12, 2003: "No lifting greater than twenty five pounds. Okay to circulate or scrub an O.R. case."
37. When plaintiff returned to work she had to obtain assistance from her co-workers when a task involved handling more than 25 pounds. Unfortunately, after plaintiff returned to work she had problems dealing with her pain while at work and was warned by her supervisor that her job performance was unsatisfactory.
38. Plaintiff's employment was terminated by defendant-employer on September 29, 2003 — exactly one month following her accident and less than 90 days of her being hired. There was no documentation of any problem with plaintiff's job performance prior to the accident of August 29, 2003. She was under injury-related work restrictions when the employer terminated her on September 29, 2003. Jill Patterson, director of surgical services, and the one who terminated plaintiff on September 29, 2003, did not ask plaintiff if her pain was causing her to move slowly or if her pain was influencing her ability to function at work.
39. Because of her pain and injury, as of the date of the hearing before the Deputy Commissioner, plaintiff had not been able to find other employment. Due to her inability to obtain and retain employment, she applied for unemployment benefits, but due to her inability to sit or stand for very long, lack of sleep (as a consequence of her pain), and her back pain, plaintiff canceled her request for unemployment benefits. Plaintiff looked for other employment, but stopped that effort until she could improve enough to be able to sustain employment.
40. Defendants contended at the hearing before the Deputy Commissioner, and on appeal to the Full Commission, that plaintiff did not sustain injury in the admitted work-related accident of August 29, 2003. However, in their Answers to Interrogatories, the defendants judicially admitted that plaintiff sustained injury in the accident of August 29, 2003. Specifically, in response to an interrogatory asking defendants whether they admitted that plaintiff suffered an injury on August 29, 2003, defendants answered:
 Objection. This interrogatory is actually a request for admission, a form of discovery not admitted by Rule 605. Notwithstanding this objection, defendants admit that the plaintiff was involved in an accident on August 29, 2003 when part of a bed fell on her. As a result of this instant, the plaintiff suffered some injury, and received medical treatment on that day which was paid for by the defendant-carrier.
Although they attempted to interpose an objection, the defendants judicially and officially admitted that the plaintiff was involved in a work-related accident, and that she sustained injury therein. In addition, and most importantly, overwhelming evidence indicates that the plaintiff sustained injury on August 29, 2003.
41. On August 30, 2003, the defendant employer's agent Robbie Hoffman, RN, filled out a "Hospital Employee Accident Report." In that report, Ms. Hoffman indicated that on Friday, August 29, 2003, at approximately 13:28 (1:28 p.m.), plaintiff injured both shoulders and her back. The description of the accident was "removing foot piece from bed and when pulling foot piece the entire half of bed (foot piece and leg section) disengaged from bed." The injury was described as "immediate weight on hands and back and it pulled body forward and then I dropped it."
42. On August 29, 2003, at approximately 14:07 (2:07 p.m.), plaintiff was seen at the Lincoln Medical Center and an Emergency Physician Record was generated. The chief complaint noted was back pain, and the doctor indicated that it was a recent injury. Acute severe pain was noted, and the Record indicated "patient lifting footboard off of OR table, bottom half of table came off and jerked her downward pulling her neck/back/arms." In a pain chart, it was indicated that the entirety of her back was painful at that time. The doctor noted that her pain was exacerbated by "movement," and it was relieved by "nothing" at that time. Plaintiff was prescribed Darvocet N100.
43. The discharge instructions to plaintiff indicated that she had sustained a cervical strain, lumbar, and muscle strain.
44. On August 29, 2003, following her treatment on that date, plaintiff was given a Work Status/Treatment Results sheet on Lincoln Medical Center stationary indicating that she had been treated on that date, and that she had limitations "and that the cause of limitations were work related."
45. On September 9, 2003, plaintiff was seen again at the Lincoln Medical Center, and on defendant employer's letterhead the diagnosis was "back sprain, bulging disc, lumbosacral radiculitis," and the cause of limitations was work related. On that date she was released to return to work on September 10, 2003.
46. Plaintiff had been working less than two weeks when injured trying to dissemble an unfamiliar operating room table. Contrary to the defendant's contention, it is clear that plaintiff had injuries as a result of the accident of August 29, 2003, and had been diagnosed with a back sprain, bulging disc, and lumbosacral radiculitis. Dr. McCloskey noted on September 10, 2003, "Impression 1. Cervical Strain. 2. Thoracic disc herniation, T8-9, small, not surgically significant. 3. Post-traumatic lumbar disc injury at L4-5. No surgery indicated." He stated "the patient is improving with time, and I suspect that with more time and not a whole lot of intervention, she will go on and improve fully. I would like to see her back in four weeks." Clearly, the overwhelming evidence is that the plaintiff sustained injury on August 29, 2003. The defendants' claim to the contrary is without merit.
47. There is no merit to the defendants' contention that the plaintiff did not suffer disability as a result of the admitted work-related accident of August 29, 2003. As set forth above, she immediately had severe pain in her upper extremities and back. She received emergency care at the defendants' hospital and then went to see Dr. Theo Igbinigie as instructed by supervisors. Dr. Igbinigie held her out of work until September 10, 2003, when she returned to work and was seen by a neurosurgeon at Dr. Igbinigie's referral. Because plaintiff had been out of work for eleven calendar days due to her work-related injury, plaintiff was entitled to compensation benefits from the defendants.
48. The essence of the defendants' contention about disability is that plaintiff is not credible. Defendants based their arguments as to her credibility on reports of their own employees, the multiple accounts of the accident contained in the medical records, the plaintiff's "unprofessional" parting with Dr. Finger, and Dr. McCloskey's testimony that he held plaintiff out of work for a number of months because she asked him and he saw no reason not to do so. Close examination will reveal that plaintiff, while theatrical at times and "unprofessional" in canceling her appointment with Dr. Finger, is a hard worker who has returned multiple times to work after injury, including this accident, and is a person whose complaints of chronic pain and resulting disability were taken seriously by her doctors, and should be taken seriously by this Commission.
49. The defendants contended that plaintiff's credibility was at issue because of multiple differing accounts of how the accident took place. When the evidence is scrutinized, Plaintiff has actually given consistent descriptions of how the accident took place: she was trying to remove part of the operating room table when it gave way unexpectedly and jerked her towards the floor, resulting in immediate upper extremity and back pain. The details of how that incident has been recorded have varied somewhat over time. Those variations are as much a function of the people who have recorded her accounts as they are of her varying descriptions of the accident.
50. Part of the difference in the description apparently arose with the defendant employer's own accident report. There, when asked to categorize the accident, category /type, Robbie R. Hoffman, RN, circled "struck by falling-moving object." The employee's actual description of the accident as revealed by that form is "immediate weight on hands and back and it's [sic] pulled body forward and then I dropped it." The emergency room Physician Record noted: "Pt. lifting footboard off of O.R. table bottom 1/2 of the table came off jerked her downward — pulling neck/back/arms."
51. When Dr. McCloskey saw plaintiff for the first time on September 10, 2003, he noted "she was taking apart an OR bed, when a greater part of the bed came apart than what she was anticipating. As such, an unexpected weight developed while she was somewhat in a flexed position causing her to abruptly flex further. She had an acute discomfort about her low back, mid back as well as her left arm."
52. When plaintiff saw Dr. Finger on February 10, 2004, his understanding of the mechanism of injury was "she was working in the operating room when she was helping disassemble a portion of an operating table, it came apart at a joint that she was unexpecting [sic] and she took a sudden heavy load, that took her down to the floor."
53. Dr. Lefavore recorded the mechanism of injury slightly differently: "experienced an injury on-the-job in which a table let go with a patient on it. She attempted to hold up the table, but was yanked to the floor."
54. The defendants' attack on the plaintiff's credibility based on the varying accounts of the injury is specious. It is clear that she gave multiple consistent accounts of the accident to a variety of individuals who each recorded their understanding of the injury in slightly different, but substantially similar ways. Rather than raising questions about plaintiff's credibility, it would seem that the relative consistency of these reports supports, rather than detracts from, her credibility.
55. At the hearing before the Deputy Commissioner, the defendants contended that the principal reason for questioning plaintiff's credibility is "the fact that she did not reveal her prior back injuries to her treating physicians." Defendants are mistaken.
56. In the first place, plaintiff's prior back injuries were not significant in terms of her condition following August 29, 2003. While she had prior back injuries and clearly revealed those to her employer in the health questionnaire she filled out prior to her employment, none of those injuries left her with any residual problems. Therefore, it was not necessary that the treating physicians be advised of any significant pre-existing back problem because none existed. While she did have degenerative changes as revealed on the MRI scan done on September 6, 2003, at Dr. Igbinigie's direction, her back had not been symptomatic prior to the accident.
57. Secondly, plaintiff did reveal the fact of prior back injury but without "chronicity of symptoms" as noted by Dr. McCloskey. "She has never had an [sic] chronicity to this back pain. She has never had any back surgery."
58. In relating prior back problems to her treating physicians, in practically every instance that was noted, plaintiff revealed the fact of prior back problems. The prior instances of back problem that were noted varied, but that is as much a function of the historian as it was of plaintiff. She was never asked for an exhaustive list of all back problems. Defendants attempt to mislead the Commission and imply that in every instance she was asked for an exhaustive list of her prior back difficulties, which is simply not accurate.
59. With respect to plaintiff's credibility, it should be noted that she had attempted to return to work with significant restrictions at the time of her termination. She was on medication and in pain. Shortly thereafter, by no later than October 31, 2003, plaintiff was depressed as noted by Dr. Burton. Termination of employment, chronic pain, depression, medication, and uncertainty about the future are all conditions that impair one's ability to give a calm and dispassionate report of your problems to those one encounters. Defendants' attacks on plaintiff's credibility seek to draw the Commission's attention away from their own lack of credibility in dealing with their injured employee. She was clearly injured on the job on August 29, 2003, and she clearly had injuries and disability resulting from that accident. Defendants have failed and refused to pay her for her disability, and they seek to have the Commission ignore their failures as they attempt to hide behind the, at times, eccentric behavior of plaintiff and the bizarre testimony of Dr. McCloskey.
60. Plaintiff initially made application for unemployment benefits after she was terminated. The defendant employer contested her entitlement to those benefits, and the matter came on for adjudication before Thelma L. Warda, an adjudicator with the Employment Security Commission. Ms. Warda determined that plaintiff was not disqualified for unemployment benefits as alleged by the employer. She found "claimant was separated from this job because the employer felt that she was not fitting in, and they had doctor and nurse complaints about her work. The employer had communicated with the claimant previously that they were concerned about her not being Southern enough since the hospital was `very Southern.'" Mr. Warda concluded "claimant was discharged but not for misconduct or substantial fault connected with the work." The Full Commission concurs with this assessment. Furthermore, under the second prong of Seagraves, plaintiff has shown that her compensable injury made her unable to earn wages both prior to and after her firing.
 ***********
Based upon the foregoing findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability.Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). Plaintiff has proved by competent evidence that she suffered a compensable injury by accident during the course and scope of her employment and is entitled to temporary total disability benefits as a result. See Id.
2. Where the exact nature and probable genesis of a particular injury involves complicated medical questions removed from the ordinary experience of the layperson, only a qualified expert witness can give an opinion as to the nature and cause of the injury. Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 265 S.E.2d 389 (1980). Plaintiff has proved by competent medical evidence that she is disabled from work due to her incident at work.
3. North Carolina law has long recognized that employees who are not yet proficient in a new job may be more susceptible to injury. Gunter v. DaycoCorp., 72 N.C. App. 329, 324 S.E.2d 621 (1985). Plaintiff had worked less than two weeks when injured trying to dissemble an unfamiliar operating room table. Contrary to the defendant's contention, it is clear that plaintiff had injuries as a result of the accident of August 29, 2003, and had been diagnosed with a back sprain, bulging disc and lumbosacral radiculitis. See Id.
4. Defendants have not proved that plaintiff constructively refused to work and plaintiff is not foreclosed from temporary total disability benefits. Seagraves v. Austin, 123 N.C. App. 228, 472 S.E.2d 397 (1996);McRae v. Toastmaster, 358 N.C. 488, 496, 597 S.E.2d 695, 701 (2004). When Plaintiff was terminated by the defendant-employer on September 29, 2003, the Industrial Commission and the Court of Appeals had interpretedSeagraves v. Austin, 123 N.C. App. 228, 472 S.E.2d 397 (1996) to allow the termination of an injured employee's employment and benefits in a manner that the North Carolina Supreme Court subsequently reversed. Chief Justice Lake, writing for the Court, stated:
 In our view, any rule that would allow employers to evade benefits payments simply because the recipient-employee was terminated for misconduct could be open to abuse. Such a rule could give employers an incentive to find circumstances that would constitute misconduct by employees who were previously injured on the job.
McRae v. Toastmaster, 358 N.C. 488, 496, 597 S.E.2d 695,701 (2004). Plaintiff was a victim of the precise abuse forecast by the Supreme Court. After she was injured, the defendant employer found alleged behaviors that had previously gone undocumented. See Id.
5. Plaintiff is entitled to medical compensation pursuant to N.C. Gen. Stat. § 97-25, including, but not limited to, payment for treatment of and medications for her depression related to her compensable injury.
6. Plaintiff is entitled to temporary total disability compensation until such time as she is able to return to her pre-injury wages and there is a job available that she could obtain. N.C. Gen. Stat. § 97-29; Russell v.Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993).
7. Defendants are entitled to a credit of two-thirds of any salary paid to plaintiff after August 29, 2003, up to a maximum of $677.37 per day for each day plaintiff's salary was actually paid after August 29, 2003. N.C. Gen. Stat. § 97-42. Although unable to work because of pain, plaintiff did report for work and was paid some salary prior to her firing on September 29, 2003. Id.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney fees set forth below, defendants shall pay plaintiff ongoing total disability compensation at a rate of $677.37 per week for the period of August 29, 2003, through the date of the hearing before the Deputy Commissioner and continuing until further order of the Commission. The amounts that have accrued shall be paid to plaintiff in a lump sum. Defendants shall pay interest at the rate of eight percent (8%) per year from June 30, 2004. Defendants shall pay directly to plaintiff's attorney as a reasonable fee of twenty-five (25%) of the lump sum and shall thereafter pay directly to such attorney every fourth check.
2. Defendants are allowed a credit of two-thirds of any salary paid to plaintiff after August 29, 2003, up to a maximum of $677.37 per day for each day plaintiff's salary was actually paid after August 29, 2003. Although unable to work because of pain, plaintiff did report for work and was paid some salary prior to her firing on September 29, 2003.
3. Defendants shall pay or reimburse those who paid for all medical care, medications, etc. furnished to plaintiff as a result of her compensable injury and resulting depression.
4. Defendants shall pay the costs.
This 18th day of July 2005.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER